**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

BRIAN ARNOLD, *et al.*,

                Plaintiffs,

v.

LME, INC., ROGER D. WILSEY, SR., AND
SHARI K. WILSEY,

                Defendants.

Civil No. 20-2082 (JRT/ECW)

**ORDER GRANTING DEFENDANTS ROGER
D. WILSEY, SR. AND SHARI K. WILSEY'S
MOTION FOR SUMMARY JUDGMENT**

---

Joshua Paul Wunderlich and Mary Katherine K. Paulus **CORNERSTONE LAW FIRM**, 5821 Northwest Seventy-Second Street, Kansas City, MO 64151; Marshall H. Tanick, **MEYER NJUS TANICK P.A.**, 330 Second Avenue South, Suite 350, Minneapolis, MN 55401; Michael J. Vanselow, **MICHAEL J. VANSELOW LAW OFFICE**, 101 South Fifth Street, Apartment 202, Minneapolis, MN 55402, for Plaintiffs.

Paul Shapiro, Abby Sunberg, and Jason R. Asmus, **TAFT STETTINIUS & HOLLISTER LLP**, 2200 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, for Defendants Roger D. Wilsey, Sr. and Shari K. Wilsey.

Plaintiffs are former employees of LME, Inc. ("LME"), who allege that LME's owners, Defendants Roger and Shari Wilsey ("the Wilseys"), are liable under the Worker Adjustment and Retraining Notification ("WARN") Act for not providing sufficient notice before shuttering LME's doors and leaving Plaintiffs out of work. Following discovery, the Wilseys now move for summary judgment on all claims, arguing that the WARN Act does not provide a cause of action against individuals unless they are the alter egos of a corporation and that no reasonable jury could find the Wilseys are alter egos of LME.

Plaintiffs have a heavy burden in this case. Because the Court concludes that a reasonable juror could not find that Plaintiffs have satisfied the high bar to pierce the corporate veil, the Court must grant the Wilseys' Motion for Summary Judgment.

## BACKGROUND

### I.   FACTUAL BACKGROUND

#### a.  Lakeville Motor Express

Lakeville Motor Express, Inc. ("Lakeville") was founded in the early 20th century by members of the Wren family to transport freight to and from terminals throughout the Midwest. (Decl. Roger Wilsey ¶ 2, May 20, 2022, Docket No. 79; Decl. Paul Shapiro ("Shapiro Decl.") ¶ 2, May 25, 2022, Docket No. 83.) Roger Wilsey spent his entire career in the trucking industry before he joined Lakeville in 2001 as an accounts receivable manager. (Shapiro Decl., Ex. A, at 5.) Roger rose through the ranks and ultimately became Lakeville's Vice President of Administration. (*Id.* at 5–6.) However, Lakeville struggled during the recession, and Roger was terminated in 2009 as a cost-reduction measure. (*Id.* at 8.)

Roger believed he could save Lakeville from financial ruin, so he and his wife Shari asked to buy Lakeville and several other companies from the Wrens. (Decl. Roger Wilsey ¶ 4; Decl. Shari Wilsey ¶ 2, May 20, 2022, Docket No. 81.) Kevin Deming joined them in the purchase. (Shapiro Decl., Ex. A, at 10.) In December 2009, the Wilseys' entity, Taylor Wilsey Ltd., Inc., ("Taylor Wilsey") purchased all the shares of Wren Corporation, which

owned 100% of Lakeville's stock.  (*Id.*; Decl. Roger Wilsey ¶ 5.)  The Wilseys then sold 25% of Taylor Wilsey to Deming.  (Shapiro Decl., Ex. A, at 10.)  Effectively, the Wilseys owned 75% of Lakeville and Deming owned 25%.  (*Id.*)

Also in December 2009, another Wilsey-owned entity, Summit Renovation and Design, Inc. ("Summit Renovation"), purchased other closely held entities.  (*Id.*)  The entities fell into three categories—cartage agents,[1] real property companies, and trucking equipment—which helped Lakeville operate.  (Decl. Roger Wilsey ¶¶ 7–9; Shapiro Decl., Ex. A at 13.)  Thus, after December 2009, Roger and Shari not only effectively owned 75% of Lakeville, but they also jointly owned several subsidiary entities that Lakeville engaged to help with its trucking operations.

### b.  Creation of LME

In December 2014, several of the cartage agents owned by Summit Renovation merged into a single entity: LME.  (Decl. Roger Wilsey ¶ 10.)  After the merger, LME operated terminals across the Midwest.  (Shapiro Decl., Ex. A at 18.)  In addition to being a cartage operator, LME also operated as a common carrier, hauling freight between LME's various terminals.  (*Id.* at 15, 18.)

### c.  Selling Lakeville and Its Decline

---

[1] A cartage agent is a carrier that performs pickup or delivery in areas that the trucking company does not service itself.  This is typically for local pickups and deliveries.  (Decl. Roger Wilsey ¶ 8, May 20, 2022, Docket No. 79.)

In 2015, Deming and the Wilseys executed a Stock Purchase Agreement, under which Deming purchased all the Wilseys' shares of Taylor Wilsey. (Decl. Roger Wilsey ¶ 15.)  Effective July 31, 2015, Roger and Shari resigned from Lakeville's board of directors. (*Id.* ¶ 17; Decl. Shari Wilsey ¶ 4.)  This left Deming as the sole owner of Lakeville.

Lakeville struggled under Deming's leadership.  (Decl. Roger Wilsey ¶ 18.)  In 2016, at Deming's request, the Wilseys caused LME to make a series of cash advancements to Lakeville totaling $1.2 million to resolve Lakeville's cash-flow issues.  (*Id.*)  These advancements were secured by a promissory note for $1 million, backed by Lakeville's assets.  (*Id.* ¶ 21, Ex. L at 62.)  Because LME still depended on Lakeville to pick up and deliver its customers' freight throughout the Twin Cities, it was in LME's interest for Lakeville to stay afloat.  (*Id.* ¶ 18.)  But Lakeville continued to struggle and failed to fulfill a handful of its contracts with LME.  Accordingly, LME cancelled its agreements with Lakeville.  (*Id.* ¶ 22, Ex. M at 72.)  One day later, Deming shut down Lakeville.  (*Id.* ¶ 24, Ex. O at 76.)  As a result of its closing, Lakeville failed to pay back more than $700,000 of its cash advancements from LME.  (*Id.* ¶ 25.)  LME wrote the $700,000 off as a bad debt. (Original Decl. Paul Shapiro, Ex. D, May 20, 2022, Docket No. 80-1.)

### d.  Operation of LME

LME employed the Plaintiffs and over 1,000 others at approximately 30 sites of employment.  (Am. Compl. ¶ 12, Aug. 6, 2019, Docket No. 3.)  The Wilseys at all relevant times directly owned, individually or jointly, and served as officers of LME.  (*Id.* ¶ 14.)  As

a dominant shareholder and LME's President and CEO, Roger had significant influence over LME's major business decisions.

LME complied with many corporate formalities.  It had articles of incorporation and maintained a formal stock ledger.  (Decl. Roger Wilsey ¶¶ 26, 27.)  LME also had corporate-governance documents, corporate bank accounts separate from the Wilseys' personal bank accounts, and kept separate financial records audited by an independent accounting firm.  (*Id.* ¶¶ 30, 32.) Moreover, LME leadership held meetings, kept minutes, and acted by written actions.  (*Id.* ¶ 28.)  LME and the Wilseys filed separate state and federal tax returns and LME's assets were never used as collateral to secure personal loans to the Wilseys or to satisfy the Wilseys' personal debts.  (*Id.* ¶ 31)

### e.  Relationship between LME and Lakeville

LME entered into many transactions on its own behalf, including with other entities owned or formerly owned by the Wilseys.  For example, LME had written agreements with vendors and leased equipment from Wren Equipment, an entity owned by Summit Renovations that also leased equipment to other entities.  (*Id.* ¶ 36.)  Further, before Lakeville shut down, LME provided administrative services to it and leased office space from Lakeville.  (*Id.* ¶ 38, Ex. Z.)  Lakeville also provided cartage services to LME. (*Id.* ¶ 14, Ex. E.)

The relationship between LME and Lakeville got more complicated after Lakeville ceased operations.  Even though the Wilseys had ceded ownership of Lakeville over three

years prior, LME stepped in in January 2019 and reached a settlement agreement with the National Labor Relations Board ("NLRB") to pay $1.25 million in back wages to Lakeville employees. (Pls.' Suggestions Opp. Mot. Dismiss, Ex. 3 ("NLRB Decision and Order") at 3, Sept. 18, 2019, Docket No. 11-3.) The NLRB Decision and Order adopted the settlement agreement, identified "LME, Inc. and Lakeville Motor Express, as alter egos,"[2] and ordered LME to cease and desist from creating alter egos for purposes of avoiding responsibilities under the National Labor Relations Act. (*Id.* at 1, 3.) The Wilseys and Lakeville were not parties to that proceeding. (*Id.*)

### f. LME Shuts Down

Over the first half of 2019, LME's financial situation worsened. One of LME's lenders raised the borrowing rate, reduced the line of credit, and required LME to pay excessive fees for renewing its credit line. (Decl. Roger Wilsey ¶ 41.) In July 2019, LME was unable to tap its line of credit to cover its payroll and other expenses and did not have enough cash to stay afloat. (*Id.*) The Wilseys had Summit Renovations inject $750,000 into LME's bank account to try to meet its financial obligations. (*Id.* ¶¶ 30, 41.) It was insufficient to save LME. Ultimately, LME was forced to cease operations and shut down on July 11, 2019, after giving its employees less than 24 hours' notice. (*Id.* ¶ 42.)

---

[2] Plaintiffs initially asserted that the NLRB "found" LME to be the alter ego of Lakeville. (Am. Compl. ¶ 46, Aug. 6, 2019, Docket No. 3.) This is untrue. Instead, the NLRB noted that while the complaint alleged that LME and Lakeville were alter egos, Lakeville was not a party to the settlement stipulation and, thus, the NLRB did not formally address this question. (NLRB Decision and Order, Ex. 3, at 11 n.1, Nov. 11, 2020, Docket No. 30-2.)

## II.    PROCEDURAL BACKGROUND

Five days after LME shut down, Plaintiffs filed this action in the Western District of Missouri, (Compl., July 16, 2019, Docket No. 1), and then filed an Amended Complaint on August 6, 2019, alleging that Defendants had violated the WARN Act and seeking certification of a class of others similarly situated.  (Am. Compl. ¶¶ 52–86.)  In response, the Wilseys filed a Motion to Dismiss under Rules 12(b)(2) and 12(b)(6), or, alternatively, to Transfer Venue pursuant to 28 U.S.C. § 1404(a).  (Defs.' 1st Mot. Dismiss, Sept. 4, 2019, Docket No. 7.)  The Missouri court granted the request to transfer the action to the District of Minnesota but denied the Motion to Dismiss because limited jurisdictional discovery was necessary before it could analyze the action on the merits.  (Order at 7, 12–13, Sept. 22, 2020, Docket No. 15.)

On October 21, 2020, the Wilseys filed a second Motion to Dismiss pursuant to Rule 12(b)(6), arguing that the Plaintiffs failed to plausibly allege that the Wilseys are alter egos of LME and therefore failed to state a plausible claim to relief.  (Defs.' 2nd Mot. Dismiss, Oct. 21, 2020, Docket No. 20.)  The Court denied the Motion to Dismiss because the Amended Complaint adequately asserted a veil-piercing theory that, if true, would establish liability.  *Arnold v. LME, Inc.*, 537 F. Supp. 3d 1050, 1057 (D. Minn. 2021).  Of significance, the Plaintiffs sufficiently pleaded that the Wilseys (1) exercised complete control of LME's finances, policy, and business practice to close LME's doors, (2) failed to observe corporate formalities such that LME was merely a façade for the Wilseys' actions,

and (3) the Wilseys had a pattern of opening and shuttering companies to avoid liability, as evidenced by Lakeville, LME, and Finish Line Express—a corporation that Plaintiffs alleged the Wilseys funded with LME's assets after LME closed. *Id.* at 1056–57.

The parties conducted discovery for one year before the Wilseys filed this Motion for Summary Judgment. (Defs.' Mot. Summ. J., May 20, 2022, Docket No. 76.) The Wilseys argue that fact discovery conclusively disproved the Plaintiffs' alter ego theory. (Defs.' Mem. Supp. Mot. Summ. J. at 6, May 20, 2022, Docket No. 78.) Plaintiffs oppose the Wilseys' Motion for Summary Judgment, asserting that genuine issues of material fact still exist because the relationship between Lakeville and LME is murky, and a reasonable factfinder could find that the Wilseys exercised sufficient control over LME to justify piercing the corporate veil. (*See generally* Pls.' Mem. Opp. Mot. Summ. J. at 4, June 10, 2022, Docket No. 84.) Plaintiffs now also argue that the corporate veil must be pierced for equity's sake. (*Id.* at 16.)

## DISCUSSION

## I.  STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a

verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party may not rest on mere allegations or denials but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Anderson*, 477 U.S. at 256 (discussing Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

## II.     ANALYSIS

### A.     The WARN Act

The WARN Act provides that "'[a]n employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order' to 'the affected employees[.]'" *Day v. Celadon Trucking Servs., Inc.*, 827 F.3d 817, 826 (8th Cir. 2016) (quoting 29 U.S.C. § 2102(a)). If an employer covered under the Act orders a plant closing without giving sufficient notice, then the employer is liable to employees suffering an employment loss for back pay and lost benefits. *See Celadon Trucking*, 827 F.3d at 827; *see also* 29 U.S.C. § 2104(a).

Ordinarily, the WARN Act shields corporate owners from personal liability and only allows plaintiffs to sue the offending company itself for violations of the Act.  Because the WARN Act defines "employer" as a "business enterprise," 29 U.S.C. § 2101(a)(1), district courts have consistently held that direct claims made against individuals, even owners, are not cognizable.  *See, e.g., Warshun v. N.Y. Cmty. Bancorp, Inc.*, 957 F. Supp. 2d 259, 267 (E.D.N.Y. 2013) (holding that "business enterprise" means "a corporate entity—i.e. corporation, limited partnership, or partnership—not an individual"); *see also Regal v. Butler & Hosch, P.A.*, No. 15-61081, 2015 WL 11198248, at *3 (S.D. Fla. Oct. 8, 2015) (collecting cases).

However, corporate owners may be held personally liable for WARN Act violations when plaintiffs can pierce the corporate veil and prove the corporation acts merely as the owners' alter ego.  *See Arnold*, 537 F. Supp. 3d at 1054 (citing *Plasticsource Workers Comm. v. Coburn*, 283 F. App'x 181, 186 (5th Cir. 2008) ("[T]his Court permits individuals to be held liable for WARN Act violations under an alter-ego theory of liability."); *Hollowell v. Orleans Reg'l Hosp. LLC*, 217 F.3d 379, 385–88 (5th Cir. 2000) (same).  Thus, the Wilseys may still be liable for LME's actions under the WARN Act if the corporate veil is pierced.

## B.   Applicable Law

Generally, "[s]tate law is viewed to determine whether and how to pierce the corporate veil."  *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 649 (8th Cir. 2003).  However, when considering a WARN Act case, other district courts have applied federal

common law instead.  *See Local 2-1971 of Pace Int'l Union v. Cooper*, 364 F. Supp. 2d 546, 565– 66 (W.D.N.C. 2005); *Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry. Co.*, 210 F.3d 18, 26–27 (1st Cir. 2000).

While the Eighth Circuit has not addressed whether federal common law should be applied in WARN Act cases, it has applied the *Scanlan* two-prong test in other federal question contexts.  *See Minn. Laborers Health & Welfare Fund v. Scanlan*, 360 F.3d 925, 927–28 (8th Cir. 2004) (adopting the Tenth Circuit's two-prong test in an Employee Retirement Income Security Act of 1974 case).  Therefore, the Court will apply it here. *Arnold*, 537 F. Supp.3d at 1056.  The two-prong *Scanlan* test **first** requires the Court to ask if "there [was] such unity of interest and lack of respect given to the separate identity of the corporation by its shareholders that the personalities and assets of the corporation and the individual are indistinct."  *Scanlan*, 360F.3d at 927–28*.*  **Second**, the Court must consider if "adherence to the corporate fiction [would] sanction a fraud, promote injustice, or lead to an evasion of legal obligations."  *Id.* (quoting *NLRB v. Greater Kan. City Roofing*, 2 F.3d 1047, 1052 (10th Cir. 1993).  The party seeking to pierce the corporate veil bears the burden of showing both prongs of the *Scanlan* test have been satisfied.  *NLRB v. Bolivar-Tees, Inc.*, 551 F.3d 722, 727 (8th Cir. 2008) (finding that the party arguing to pierce the veil "bears the burden of proving that there are substantial reasons for doing so").

C.      **Applying the *Scanlan* Two-Prong Test**

To avoid granting summary judgment, the Court must find that a reasonable jury could conclude that Plaintiffs satisfy both prongs of the *Scanlan* test.  Disregarding the entity's corporate form by piercing the corporate veil or under the alter ego theory "is an extraordinary measure that should be reserved for exceptional circumstances."  *HOK Sport, Inc. v. FC Des Moines, L.C.*, 495 F.3d 927, 935 (8th Cir. 2007).  The Plaintiffs have a very heavy burden, and courts should "only reluctantly and cautiously" pierce the corporate veil.  *Bolivar-Tees, Inc.*, 551 F.3d at 727.  Because the Court concludes that Plaintiffs are unable to satisfy this heavy burden, it must grant the Wilseys' Motion.

1.      ***Scanlon* Prong 1**

*Scanlan*'s first prong requires the Court to consider if there was such unity of interest and lack of respect given to the separate identities of the shareholders and the corporation such that they are indistinct.  *Scanlan*, 360 F.3d at 927–28.  The Eighth Circuit has elaborated on this prong.  In determining whether the personalities and assets of the corporation and the individual are indistinct, courts should consider the degree to which corporate legal formalities have been maintained and the degree to which individual and corporate assets and affairs have been commingled.  *Bolivar-Tees, Inc.*, 551 F.3d at 728.  The Court may consider, among other factors:

> (1) whether the corporation is operated as a separate entity;
> (2) the commingling of funds and other assets; (3) the failure
> to maintain adequate corporate records; (4) the nature of the

corporation's ownership and control; (5) the availability and use of corporate assets, the absence of same, or under capitalization; (6) the use of the corporate form as a mere shell, instrumentality or conduit of an individual or another corporation; (7) disregard of corporate legal formalities and the failure to maintain an arm's-length relationship among related entities; (8) diversion of the corporate funds or assets to noncorporate purposes; and ... (9) transfer or disposal of corporate assets without fair consideration.

*Id.* (citing *White Oak Coal Co., Inc.*, 318 N.L.R.B. 732, 735 (1995); *accord Greater Kan. City Roofing*, 2 F.3d at 1052 n.6).  No one factor is dispositive, and not all factors must be present for the veil to be pierced.  *Id.*

Here, most factors weigh against piercing the corporate veil.  LME maintained corporate records, a corporate bank account, and a stock ledger.  The Wilseys never used LME funds for personal purposes or to secure personal loans, and LME filed tax returns separate from the Wilseys' individual returns.  Moreover, LME leadership held meetings, kept minutes, and acted by written actions.[3]

Though LME complied with most corporate formalities, the parties dispute (a) the nature of LME's ownership and control, (b) availability and use of corporate assets, and

---

[3] Regarding LME's leadership, the Plaintiffs argue that LME did not have a board of directors, which weighs in favor of piercing the corporate veil.  The record is contradictory on this matter.  (*Compare* Decl. Joshua P. Wunderlich, Ex. F at 35, 42–43, June 10, 2022, Docket No. 85-6 (suggesting there is no board of directors); *with* Decl. Roger Wilsey. ¶ 28, Ex. R (suggesting there was a board of directors).)  However, this issue does not constitute a genuine dispute of material fact because, in either scenario, the record demonstrates that there was some type of leadership structure including individuals outside of the Wilsey family.  (*See, e.g., id.*)  Whether these individuals are directors or officers is not dispositive, and the Court does not find this dispute of fact sufficiently material to overcome summary judgment.

(c) the Wilseys' failure to maintain an arm's-length relationship between LME and Lakeville.

### a.    Nature of LME's Ownership and Control

First, the parties dispute the nature and control of LME.  This factor weighs against piercing the corporate veil.

The Plaintiffs compare the Wilseys to the shareholders in *Bolivar-Tees* to argue that the Wilseys have not maintained a separate identity from the corporations at issue.  *See Bolivar-Tees*, 551 F.3d at 729.  In *Bolivar-Tees*, the Eighth Circuit upheld a NLRB Order piercing the corporate veil.  The Court found that the first *Scanlan* prong was satisfied in part because a single shareholder controlled and owned four interconnected corporations, and he directed the decision-making of each corporation.  *Id.*  The Plaintiffs argue that *Bolivar-Tees* is similar in that the Wilseys owned Summit, which in turn owned many subsidiaries, and Summit's various subsidiaries had a revolving line of credit, collateralized by all assets of LME and its affiliates.  Further, Roger Wilsey was in complete control of LME, as evidenced by the Wilseys' decision to inject $750,000 from Summit Renovations into LME in July 2019 as a last-ditch effort to keep LME afloat.

However, *Bolivar-Tees* is distinguishable.  There were many other factors that weighed in favor of piercing the corporate veil.  Of import, the corporations at issue did not operate as separate entities.  *Bolivar-Tees*, 551 F.3d at 729.  They were covered by the same insurance plan and had a joint profit-sharing scheme.  *Id.*  They failed to

-14-

document transactions between the two corporations. *Id.* They did not adequately charge each other for services rendered. *Id.* Moreover, the corporations and the shareholder "readily commingled funds, failed to maintain adequate corporate records, disregarded corporate legal formalities, and failed to maintain an arm's-length relationship." *Id.* And, perhaps most importantly, the shareholder kept one corporation profitable in part by rending another corporation unprofitable. *Id.* None of those factors are present here.

Further, the fact that Roger Wilsey exercised control over LME alone does not justify piercing the corporate veil. It is irrelevant that Roger Wilsey acted as the CEO and President of LME because merely operating a business does not expose an owner to liability. *See, e.g.*, *NLRB v. Fullerton Transfer & Storage Ltd., Inc.*, 910 F.2d 331, 342 (6th Cir. 1990).[4] To pierce the veil, Plaintiffs must do much more than show that Roger Wilsey exercised control over LME.

_____

[4] Of relevance, the *Fullerton* court explained that "owner-operated corporations are not only a common business structure in this country, but have always been recognized as a method of limiting even a small business owner's personal liability. Although it is true that owner-operated businesses are more likely to commit acts that will lead courts to find the owners personally liable, liability under a common law doctrine cannot be premised on the owner-operated status of the business itself. Thus it is irrelevant that the [owner] made decisions on behalf of the corporation and that there was a unity of management and ownership in [the businesses]." *NLRB v. Fullerton Transfer & Storage Ltd., Inc.*, 910 F.2d 331, 342 (6th Cir. 1990).

Because many of the elements that would give weight to this factor's satisfaction are absent here and Roger Wilsey's involvement in LME is not dispositive, the nature and control factor weighs against piercing the corporate veil.

### b.    Availability and Use of Corporate Assets

Second, the parties dispute whether LME properly used its corporate assets. Courts discussing this factor typically focus on the adequacy of capitalization, which "must be measured at the time of incorporation because it reveals whether the corporation was created to avoid liability." *Bolivar-Tees*, 551 F.3d at 730 n.7.  However, Plaintiffs do not allege that LME was undercapitalized.  Rather, Plaintiffs assert that Summit Renovations' subsidiaries—including LME—paid dividends to Summit in excess of their net revenue and that Summit then paid out dividends to the Wilseys in excess of what it brought in.

Though LME and its affiliated entities often paid out more than they brought in each year, they never paid out more than their retained earnings.  (*See, e.g.,* Pls.' Ex. D at 22–23, June 10, 2022, Docket No. 88.)  Though perhaps a questionable business decision, paying out more than net income does not create a necessary inference that LME is a façade for the Wilseys' dealings.  Overall, the availability and use of corporate assets neither favors nor disfavors veil-piercing.

### c.       Arm's-Length Relationship

Lastly, the parties dispute whether the Wilseys operated LME and Lakeville at arm's-length. Plaintiffs argue they did not based on (1) the unrecovered $700,000 loan LME made to Lakeville and (2) LME's failure to appropriately pay Lakeville for services.

The Eighth Circuit has found that failure to keep accurate records of debts and unjustified debt forgiveness may demonstrate that corporations do not operate at arm's-length. *See Bolivar-Tees*, 551 F.3d 729–30. Here, LME made a series of cash advancements, totaling $1.2 million, to Lakeville to keep it from closing. It obtained a promissory note in the amount of $1 million, secured by Lakeville's assets. When Lakeville closed, it had failed to repay LME over $700,000. LME concluded that Lakeville's debt was uncollectable and wrote it off, which the Plaintiffs argue demonstrates the companies did not maintain an arm's-length relationship.

The Eighth Circuit has also suggested that failure to pay market value for goods and services indicates parties are not operating at arm's-length. *See Bolivar-Tees*, 551 F.3d at 729–30. Here, Lakeville rented space to LME, but no research was done into the market value of the rental space. The record also indicates that Lakeville provided "numerous services" to LME, but they were done for only a "very nominal fee" that is "less than what one person would cost to do just one piece of that work." (Decl. Joshua P. Wunderlich, Ex. F at 8, June 10, 2022, Docket No. 85-6.)

Ultimately, these two arguments relate only to piercing the corporate veil between Lakeville and LME—not between LME and the Wilseys. There is no suggestion that the Wilseys should be personally liable for the offenses of LME. Though these facts speak to an alter ego relationship between Lakeville and LME, they do not indicate an alter ego relationship between LME and the Wilseys. Therefore, this factor does not advance the case for piercing the corporate veil as to the Wilseys.

Given that the vast majority of factors weigh against piercing the corporate veil, a reasonable jury could not find the first *Scanlan* prong to be satisfied. Failure to satisfy this prong alone is dispositive in this case. However, the Court will also analyze *Scanlan*'s second prong for the sake of completeness.

### 2.     *Scanlan* Prong 2

The second *Scanlan* prong requires Plaintiffs show that "adherence to the corporate fiction [would] sanction a fraud, promote injustice, or lead to an evasion of legal obligations." *Scanlan*, 360 F.3d at 928 (quotation omitted). The Eighth Circuit has indicated that courts should consider whether the corporate structure has been misused to perpetrate fraud, evade existing obligations, or circumvent a statute. *See Bolivar-Tees*, 551 F.3d at 729. In other words, the second *Scanlan* prong looks for causation and culpability. *Id.* A corporation's inability to pay its debt alone is not sufficient to support a finding of injustice. *Id.* Rather, "[i]t is only when the shareholders disregard the

separateness of the corporate identity *and when that act of disregard causes the injustice or inequity or constitutes the fraud* that the corporate veil may be pierced." *Greater Kan. City Roofing*, 2 F.3d at 1053 (emphasis in original). Shareholders will only be held personally liable when they have "some level of culpability for the injustice." *Bolivar-Tees*, 551 F.3d at 729.

To support this prong, Plaintiffs offer two theories. First, Plaintiffs argue they will suffer substantial injustice if the veil is not pierced because they are owed unpaid wages. Second, Plaintiffs argue the Wilseys have a pattern of opening and shuttering businesses to avoid liability and evade their legal obligations.

### a.    Substantial Injustice

First, Plaintiffs contend that the second *Scanlan* prong is satisfied because LME's former employees have not yet been paid, so they will suffer substantial injustice if the Wilseys are not held liable. The Plaintiffs provide no caselaw to support this contention, and Eighth Circuit precedent demonstrates this argument has no legal basis. In *Bolivar-Tees*, the Eighth Circuit explained that "[a] corporation's inability to pay its debts alone is not sufficient to support a finding of injustice" under the second *Scanlan* prong. *Bolivar-Tees*, 551 F.3d at 729. *See also Greater Kan. City Roofing*, 2 F.3d at 1053. Unpaid wages are a debt, so they are insufficient to justify piercing the corporate veil on their own. On this theory, Plaintiffs have failed to satisfy the second *Scanlan* prong.

-19-

**b. Opening and Shuttering Businesses**

Independently, Plaintiffs argue that the Wilseys' pattern of opening and shuttering businesses perpetuated a fraud that allowed them to avoid their legal obligations under the WARN Act.  Plaintiffs survived the Wilseys' Motion to Dismiss by asserting that (1) the Wilseys owned Lakeville, and that its employees were terminated without proper notice before Lakeville went bankrupt; (2) afterward, the NLRB ordered LME, which had taken over Lakeville's operations, to cease and desist from creating alter egos to avoid federal obligations; and, lastly, (3) Finish Line Express, a company owned and controlled by an LME officer, took over LME's operations after LME went bankrupt.  *Arnold*, 537 F. Supp.3d at 1057.  If true, these assertions would demonstrate that the Wilseys used corporate structure to close facilities and evade federal obligations.[5]

However, discovery has disproven much of the Plaintiffs' assertions.  For example, the Plaintiffs now admit that they were wrong about the Wilsey's involvement in Finish

---

[5] *See Schenley Distillers Corp. v. United States*, 326 U.S. 432, 437 (1946) ("While corporate entities may be disregarded where they are made the implement for avoiding a clear legislative purpose, they will not be disregarded where those in control have deliberately adopted the corporate form in order to secure its advantages and where no violence to the legislative purpose is done by treating the corporate entity as a separate legal person."); *Bruhn's Freezer Meats of Chicago, Inc. v. U.S. Dept. of Agriculture*, 438 F.2d 1332, 1343 (8th Cir. 1971) ("The law is well settled that the corporate entity may be disregarded when the failure to do so would enable the corporate device to be used to circumvent a statute.") (internal citation omitted).

Line Express, which in fact was not owned by the Wilseys, had operated in a different sphere of the trucking industry, and opened several years before LME closed.

Though Finish Line may not support the Plaintiffs' theory that the Wilseys have a pattern of opening and shuttering business, the murky relationship between Lakeville and LME may still support Plaintiffs' assertion.

Plaintiffs point to the settlement agreement between LME and the NLRB to support their theory. There, LME agreed to pay $1.25 million in owed wages to Lakeville's former employees—despite having no apparent obligation to do so. (NLRB Decision and Order at 3.) The NLRB then adopted the settlement and ordered LME to cease and desist from "creating alter-egos for purposes of avoiding responsibilities and obligations" under the National Labor Relations Act. (*Id.* at 2–3.) This settlement agreement raises obvious questions about the relationship between Lakeville and LME and could lead a reasonable jury to conclude that the Wilseys had a pattern of opening and shuttering businesses to avoid liability under federal law.

The Wilseys argue that the NLRB agreement is inadmissible evidence under Federal Rule of Evidence 408, which means the Court cannot consider it at the summary judgment stage. *See Shaver v. Independent Stave Co.*, 350 F.3d 716, 723 (8th Cir. 2003) (explaining that inadmissible evidence cannot be used to defeat a motion for summary judgment). But Rule 408 is not applicable here.

Generally, NLRB orders are admissible and will be enforced "as long as [they have] correctly applied the law and [their] factual findings are supported by substantial evidence on the record as a whole." *North Mem'l Health Care v. National Labor Relations Board*, 860 F.3d 639, 645 (8th Cir. 2017).  However, Federal Rule of Evidence 408 provides that compromise offers and negotiations are inadmissible to prove validity of a disputed claim.  Fed. R. Evid. 408; *see also Weems v. Tyson Foods, Inc.*, 665 F.3d 958, 964–65 (8th Cir. 2011).  Rule 408 promotes "the public policy favoring the compromise and settlement of disputes."  Fed. R. Evid. 408 advisory committee's note (1972).  When "the issue is doubtful, the better practice is to exclude evidence of compromises or compromise offers."  *Weems*, 665 F.3d at 965 (parenthetically quoting *Bradbury v. Phillips Petrol. Co.*, 815 F.2d 1356, 1364 (10th Cir. 1987)).

To determine whether a settlement agreement is admissible under Rule 408, courts first analyze whether the settlement agreement is related to a claim that is in dispute.  *Weems*, 665 F.3d at 965.  Rule 408 only prohibits admitting compromise evidence related to a "claim" that was disputed when the settlement negotiations or offer to compromise took place.  *Crues v. KFC Corp.*, 768 F.2d 230, 233 (8th Cir. 1985).  Courts must then assess whether the settlement agreement is being offered to prove a party's liability or for the validity of the claim, rather than for another acceptable purpose. *Weems*, 665 F.3d at 965.

Here, the NLRB Decision and Order is not being offered to prove a party's liability or for the validity of the claim.  Though the NLRB Decision and Order would be inadmissible to prove that LME is liable for Lakeville's debts, that is not the purpose here. The Plaintiffs seek to pierce the corporate veil between LME and the Wilseys, not between LME and Lakeville.  They rely on the NLRB Decision and Order not to show that LME and Lakeville are alter egos, but rather to generally raise suspicion as to the Wilseys' dealings. Since the NLRB Decision and Order is not being used to prove the validity of a disputed claim, it is not barred by Rule 408.

Given that the NLRB Decision and Order is admissible, a reasonable jury might use that evidence to find the Wilseys routinely opened and shuttered businesses in order to sanction a fraud, promote injustice, or evade legal obligations—satisfying the second prong of *Scanlon*.  In many respects, equity favors the Plaintiffs in this dispute.  The WARN Act was clearly violated and it is fundamentally unfair to deny Plaintiffs the wages protected by the Act.  However, because Plaintiffs must satisfy both prongs of the *Scanlan* test to pierce the corporate veil and hold the Wilseys liable, Plaintiffs have not met their heavy burden. The Court simply cannot find that the first *Scanlan* prong is satisfied on the record in this case.  Thus, the Court has no choice but to grant the Wilseys' Motion for Summary Judgment.

**CONCLUSION**

Defendants Roger and Shari Wilsey moved for summary judgment on all claims, arguing no reasonable jury could find enough evidence to pierce the corporate veil and hold the Wilseys personally liable for LME's violation of the WARN Act.  To pierce the corporate veil, Plaintiffs must satisfy both prongs of the Eighth Circuit's two-prong *Scanlan* test.  Though Plaintiffs may have enough evidence to satisfy the second prong, they failed to meet their heavy burden under the first prong.  Therefore, the Court will grant the Wilseys' Motion for Summary Judgment.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [Docket No. 76] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  January 12, 2023
at Minneapolis, Minnesota.

_____
JOHN R. TUNHEIM
United States District Judge